89 F.3d 838
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Tracey ELLIS, Plaintiff-Appellant,
v.
BLOOD SYSTEMS, INCORPORATED, doing business as United Blood
Services, Defendant-Appellee.
 No. 95-2114.
 United States Court of Appeals, Seventh Circuit.
 Submitted June 25, 1996.*
Decided June 25, 1996.
 
 Before CUMMINGS, PELL and FLAUM, Circuit Judges.
 
 ORDER
 
 1
 Plaintiff-appellant Tracey Ellis filed suit against defendant-appellee Blood Systems, Inc., d/b/a United Blood Services ("UBS") claiming that she was denied a promotion and later terminated because she is African-American, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The district court granted summary judgment to UBS, and Ellis appeals. We affirm.
 
 I. FACTS
 
 2
 UBS is a not-for-profit organization that provides blood and blood derivatives to area hospitals. UBS does not pay for the blood products that it delivers to hospitals; instead, it relies on blood donations. As a consequence, UBS employs telerecruiters whose job it is to recruit existing and potential blood donors by telephone and to schedule them to donate. The position requires good public relations skills, especially with donors and institutions that have exhibited a willingness to sponsor blood drives. UBS provides its telerecruiters a written "Training Program for Customer Service," and it requires each telerecruiter to pass a test regarding its contents. Telerecruiters receive call lists that include the names of donors and potential donors to be called. Sometimes these lists duplicate certain names and cause different telerecruiters to call the same donor multiple times.
 
 
 3
 Ellis is an African-American female who joined UBS as a part-time telerecruiter on May 13, 1991. In August 1991, she pursued a UBS course of study and demonstrated proficiency in customer service. UBS awarded her a Certificate of Qualification on August 31, 1991. Until her termination in January 1992, Ellis consistently rated among the top five telerecruiters in both appointments per hour and total appointments.
 
 
 4
 In approximately September 1991, David Peasley, who as a Community Relations Representative ("CRR"), was Ellis' immediate supervisor, informed Ellis of an opportunity to apply for one of three vacant CRR positions. A CRR is a full-time, salaried position responsible for recruiting donors by interacting with the community and establishing blood drives at various institutions. Effective interpersonal skills are a vital requirement for the position.
 
 
 5
 Ellis applied for one of the CRR vacancies. Mr. Michael Anania, the Director of Community Relations at UBS, interviewed Ellis as well as other candidates vying for the CRR positions. Ellis was the only African-American candidate. Anania screened out some of the candidates he interviewed after the first or second round of interviews and interviewed the finalists a third time. Anania interviewed Ellis three times. At the end of the third interview with Ellis, Anania grabbed Ellis' notepad on which she had been taking notes of her interviews. He stated that he wanted to see what she had been writing. After reviewing the notes, he tore them up and threw them in the trash.[1]
 
 
 6
 Anania chose among the candidates by considering primarily: (1) each candidate's ability to interact with a wide range of individuals within business and community organizations, (2) the degree to which each candidate had some type of sales, marketing promotional or other public relations skills, and (3) the previous positions held by the candidates, their job responsibilities, and other relevant facts regarding the candidates' job histories. The job description for the CRR position lists responsibilities that are compatible with Anania's selection criteria. For example, the CRR job description states that, among the various duties expected of a CRR, a CRR is required: to interact with blood drive coordinators and committees, to maintain an ongoing public and media relations program, and to communicate effectively with various departments and staff to coordinate blood drives and to train volunteers. See R.Doc. 30, Exh. A-1.
 
 
 7
 Anania selected three non-minority candidates to fill the CRR vacancies. According to Anania, each of the candidates he selected exhibited excellent communication and interpersonal skills when he interviewed them. He further believed that each exhibited better communication and interpersonal skills than Ellis, who he felt exhibited poor person-to-person interactive skills during her interview. In addition, each had demonstrated greater job stability than Ellis, switching jobs less frequently. Ellis' resume indicated that she had held seven positions over the previous six years and that she did not hold any of those positions for as long as one year (other than part-time consulting work). Each of the three candidates chosen had held fewer jobs over the same period of time and had held at least one job for longer than a year. R.Doc. 30, Exh. A, pp 12, 13 & 16.
 
 
 8
 Ellis possessed certain skills and knowledge that the other candidates lacked. Ellis had worked for UBS and had been thorough and well-organized. She knew UBS' product and had inside experience with the company. R.Doc. 36, p 16. As a result, Ellis disputes Anania's conclusion that she was not as qualified for a CRR position as the three successful candidates.
 
 
 9
 Ellis expressed to Anania her disappointment at not being selected, and Anania told her that she would be the first person considered for the position if one of the three candidates failed to work out in six months. In October, Ellis again met with Anania to express her concerns about not getting a CRR position. During the meeting, she was told that the other candidates had better communication skills but that she would be the first person considered by Anania if an opening arose. R.Doc. 36, pp 18 & 19.
 
 
 10
 In December 1991, one of the three candidates who had been chosen over Ellis for the CRR position, Christopher Casey, stopped working for UBS. Another CRR assumed Casey's duties.[2]
 
 
 11
 On January 7, 1992, Ellis placed a call to Margery Hansen, an employee of Abbott Laboratories, Inc. ("Abbott") asking her to donate blood. Hansen informed Ellis that she had already been called that day and was extremely busy. On her call sheet, Ellis noted Hansen's request that she not be called anymore. Ellis did not call Hansen the remainder of the day. That same day, however, Hansen complained to UBS that she had received approximately five telephone calls, all that day and all from the same female person. According to Hansen, in four of the calls, the caller asked Hansen to donate; in one call, the caller asked Hansen about information concerning employment at Abbott. The caller refused Hansen's requests that she identify herself. Hansen was aggravated by these calls and viewed them as harassment. At the time, Abbott was one of UBS' two largest accounts.
 
 
 12
 Upon learning of Hansen's complaint, Anania immediately launched an investigation. He considered this to be a very serious matter because the conduct complained of was highly inappropriate and could jeopardize UBS' relations with the public. First, he called Abbott's Blood Drive Coordinator, Theresa Kovack, and she verified the call information (as received from Hansen). Anania then instructed Bill Kelly, one of the supervisors of the telerecruiters, to investigate the matter. (Peasley, who would have normally investigated such a complaint, was out of the office at the time). Kelly checked each telerecruiter's call list and determined that Hansen was on Ellis' call list. He further determined that Ellis had placed her initials by Hansen's name, indicating that she had called Hansen. Kelly found no call list or other information indicating that anyone else had called Hansen. Kelly reported his findings to Anania.
 
 
 13
 Anania then called Ellis into his office. She admitted calling Hansen but claimed that she did so just once that day. When Peasley returned to the office that afternoon, Anania spoke to him about the matter, and they jointly decided that Ellis' employment would be terminated. They informed Ellis of their decision that day.
 
 
 14
 Several days prior to her termination, Ellis found on her desk a letter purporting to be from the Ku Klux Klan. Ellis did not immediately inform anyone at UBS about the letter because she wanted to meet with supervisors personally about it.
 
 II. ANALYSIS
 
 15
 Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer
 
 
 16
 to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.
 
 
 17
 42 U.S.C. § 2000e-2(a)(1). Ellis alleges that UBS violated this provision by failing to promote her to a CRR position and by terminating her, all because of her race. UBS argues that it made these employment decisions based on legitimate, nondiscriminatory reasons.
 
 
 18
 Under the Federal Rules of Civil Procedure, a motion for summary judgment should be granted
 
 
 19
 if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
 
 
 20
 F.R.C.P. 56(c). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir.1993). Thus, to resist UBS' motion for summary judgment, Ellis must identify a genuine issue of material fact or explain why UBS was not entitled to a judgment as a matter of law despite the absence of such an issue. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (party bearing burden of persuasion must set forth specific facts supporting all essential elements of that party's case to avoid summary judgment). Ellis argues that, in accordance with the indirect, burden-shifting method of proving discrimination first outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), she can set forth facts establishing a prima facie case for racial discrimination and that UBS' ostensible reasons for not promoting her and for firing her were pretextual.
 
 
 21
 UBS argues that Ellis cannot successfully resist summary judgment through the McDonnell Douglas approach. UBS does not dispute that Ellis can make out a prima facie case of racial discrimination; rather it argues that it has offered legitimate, nondiscriminatory reasons for its adverse employment decisions with regard to Ellis and that Ellis has failed to produce evidence from which a trier of fact could rationally conclude that its reasons were pretextual.
 
 
 22
 According to UBS, it did not promote Ellis because she was not as qualified as those who it promoted over her. Anania stated in his affidavit that he believed that Ellis' interpersonal skills were not as good as the three candidates who were chosen and that they had demonstrated greater job stability than Ellis. These qualities are legitimate criteria for the CRR position. The job description for the CRR lists a number of duties and requirements for the position that require good interpersonal skills, including: training, motivating, and directing blood drive coordinators and committees to assure successful and productive blood drives; maintaining an ongoing public and media relations program in an assigned area; and communicating effectively with technical department/hospital services department and the collection staff to properly coordinate blood drives and in-center activities. R.Doc. 30, Exh. A-1.
 
 
 23
 Ellis responds by arguing that UBS' stated reasons for not promoting her are pretextual. As for how her interpersonal skills compared with those of the three candidates selected by Anania, Ellis asserts that this is a material fact in dispute. However, she offers no evidence that would support her conclusion that her interpersonal skills were equal to or better than those of the other candidates. In fact, she concedes that she "can not present direct evidence relating to how well the other candidates performed in their interviews." R.Doc. 35 at 3. Instead, she maintains that she received favorable evaluations as a telerecruiter and that, to excell as a telerecruiter as she did, she had to possess excellent interpersonal skills. Assuming this to be true, it still does not establish that she demonstrated better interpersonal skills in her interview than the three selected candidates. More important, evidence of Ellis' fine interpersonal skills, apart from any evidence of the other candidates' interpersonal skills, is insufficient to enable a jury to rationally conclude that Anania did not honestly believe that Ellis' interpersonal skills were not as good as the others. Sample v. Aldi, Inc., 61 F.3d 544, 549 (7th Cir.1995) (affirming grant of summary judgment because plaintiff failed to show that supervisor did not honestly believe that plaintiff was unfit for promotion). In addition, Ellis argues that she, alone among the candidates, had worked at UBS and had experience at recruiting blood donors over the phone. Although Ellis' telerecruiting background helped her meet some of the criteria for the CRR position (e.g., marketing and public relations skills), it does not automatically mean that she was the best qualified candidate, or that Anania could not have honestly believed that the other candidates exhibited better interpersonal skills than Ellis.
 
 
 24
 Ellis also argues that the issue of her job stability is pretextual because (1) UBS was aware of her job history long before the third interview but still considered her for the CRR position, and (2) the three successful candidates also had listed on their applications jobs which they had held for less than one year. Both arguments fail. First, UBS never claimed that Ellis' job history rendered her unqualified for a CRR position, just less qualified than those who were hired over her. Second, Ellis' contention that each of the three successful candidates listed at least one job which they held for less than one year is irrelevant. Each of them still exhibited greater job stability than Ellis. Even if some of them did hold one job for less than one year, Ellis' application showed that she held virtually all of her previous jobs for less than one year. Her application clearly displayed less job stability than the others.
 
 
 25
 Further attempting to demonstrate pretext, Ellis points to the fact that Anania failed to fulfill his promise that she would be the first candidate to be considered for a CRR position if any of the three successful candidates left within six months. She also relies on the fact that Anania tore up her interview notes after her third interview and, of course, the KKK letter.
 
 
 26
 These facts would not enable a trier of fact to reasonably conclude that Anania's real motive for not promoting Ellis was her race. Casey left in December 1991, and Ellis was terminated in early January 1992, meaning that the CRR opening arose about one month before Ellis left UBS. UBS did not replace Casey with anyone prior to Ellis' termination. Thus, even if UBS intended to fill Casey's position, it is quite possible that UBS had insufficient time in which to do so. The fact that Anania tore up Ellis' notes at the end of her last interview is likewise unhelpful to Ellis because she failed to press this point before the district court. As a result, it is waived. Hayden v. La-Z-Boy Chair Co., 9 F.3d 617, 621-22 (7th Cir.1993), cert. denied, 114 S.Ct. 1371 (1994). As for the KKK letter she found on her desk, Ellis admitted in her deposition that she did not know who put the letter there.[3] Thus, she has failed to produce any evidence linking the letter to Anania, who made the decision not to promote her.
 
 
 27
 Accordingly, Ellis has not presented any evidence from which a trier of fact could rationally conclude that UBS's reason for not promoting her to a CRR position was pretextual. See Sample v. Aldi, 61 F.3d 544, 550 (7th Cir.1995).
 
 
 28
 With regard to Ellis' termination, UBS maintains that it discharged her because Anania and Peasley honestly believed that she had made harassing phone calls to Hansen, an employee of one of UBS' biggest donor institutions.[4] In response, Ellis claims that, by denying making more than one call to Hansen, she has raised a genuine issue of material fact as to whether this stated reason is a pretext.
 
 
 29
 For purposes of this appeal, we accept Ellis' denial that she made more than one call to Hansen on January 7, 1992. The relevant issue on appeal, however, is whether she has presented sufficient evidence from which a trier of fact could rationally conclude that Anania and Peasley did not honestly believe that she made multiple calls to Hansen that day. Sample, 61 F.3d at 548. To resolve this question, we must consider what evidence Anania and Peasley had available to them when they decided to fire Ellis.
 
 
 30
 After Kelly investigated Hansen's complaint, Anania and Peasley knew that Hansen contacted UBS and complained that she had received five calls from UBS that day and that each call was from the same female person; that Hansen had no apparent reason to lie to UBS; that Ellis' call list was the only one with Hansen's name on it; that Ellis had placed her initials beside Hansen's name, indicating that she had called Hansen that day; and that Ellis admitted making one call to Hansen that day. Given these facts, the most logical conclusion for Anania and Peasley to draw was that Ellis did make multiple calls to Hansen that day. Given the fact that Hansen had no reason to lie and that the evidence pointed to Ellis as the only telerecruiter to call Hansen, it would indeed be illogical to conclude otherwise.
 
 
 31
 Ellis suggests that one might reasonably conclude that she did not make multiple calls to Hansen because different UBS telerecruiters often had the same names on their call lists, and, as a result, donors were often called on the same day by different telerecruiters. This alternate explanation falls short in this case, however, because Kelly checked the call lists on the day Hansen lodged her complaint, and he found that Ellis' list was the only one that had Hansen's name on it. Thus, Anania and Peasley had no reason to believe that overlapping lists caused the multiple calls to Hansen.
 
 
 32
 Ellis also argues UBS' stated reason for firing her was pretextual because, prior to her firing, other donors had made complaints against non-minority telerecruiters, yet those complaints did not result in termination. As UBS points out, Ellis provides no record support for this assertion. In any case, the evidence of record indicates, if anything, that race was not a factor in the decision to terminate Ellis. It is clear that Anania viewed the series of harassing calls to Hansen as an extremely serious incident before he knew that any evidence pointed to Ellis as being the caller. For example, immediately upon learning of Hansen's complaint, he contacted Kovack at Abbott to verify the complaint. Then, he instructed Kelly to investigate the incident, rather than wait for the arrival of Mr. Peasley, who ordinarily would have been responsible for investigating the complaint. Given the importance of maintaining good relations with the public, and especially a big donor institution such as Abbott, Anania's extreme concern is entirely reasonable and does not suggest disparate treatment towards Ellis.[5] Accordingly, Ellis has failed to present sufficient evidence from which a trier of fact could reasonably conclude that Anania and Peasley fired her due to her race rather than an honest belief that she made repeated, harassing telephone calls to Hansen.
 
 III. CONCLUSION
 
 33
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 *
 After an examination of the briefs and the record, we have concluded that oral argument is unnecessary, and the appeal is submitted on the briefs and the record. See Fed.R.App.P. 34(a); Cir.R. 34(f)
 
 
 [1]
 Although UBS disputes that this incident (as well as others) occurred, UBS and the court accepts Ellis' version of the facts for purposes of this appeal
 
 
 [2]
 Ellis asserts in her brief that Casey's position was filled by a non-minority person. However, the evidence in the record on appeal supports UBS' contention that Casey was not replaced, as Ellis seems to imply, but rather his duties were absorbed by another CRR. See R.Doc. 42 at p 22; R.Doc. 36 at p 25
 
 
 [3]
 See R.Doc. 30, Exh. B, p. 374. Ellis apparently named Anania as the person she believed put the KKK letter on her desk, but she articulated no reason for holding such a belief
 
 
 [4]
 Several months prior to Ellis' termination, UBS received a complaint from another donor concerning Ellis, but UBS has never placed much reliance on that incident to justify its firing of Ellis. R.Doc. 30, Exh. A-10 (reprimand); Ae.Br. 9 & 18
 
 
 [5]
 For the reasons discussed in connection with the failure to promote issue, the KKK letter provides insufficient evidence from which a trier of fact could conclude that the stated reason for Ellis' firing was pretextual